William W. EDDY, Jr., Plaintiff,

v.

Larry G. MASSANARI,[1] Commissioner of Social Security, Defendant.

No. CIV.A. 01–2217–KHV.

United States District Court, D. Kansas.

Jan. 9, 2002.

---

**1.** Larry G. Massanari became Commissioner of Social Security on March 29, 2001. The Court takes judicial notice of the fact that Massanari shall substitute for Acting Commissioner William A. Halter as defendant in this suit. See Fed.R.Civ.P. 25(d)(1). The parties do not need to take further action to continue this suit. See 42 U.S.C. § 405(g).

Jean C. Owen, Law Office of Jean C. Owen, Mission, KS, for Plaintiff.

Christopher Allman, Office of United States Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

■ William W. Eddy, Jr. brings suit under 42 U.S.C. §§ 405(g) seeking judicial review of the Commissioner's decision to deny disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401 et seq. The Court previously remanded this case for findings regarding plaintiff's past relevant work and his ability to complete that work with his hearing impairment. This matter is before the Court on plaintiff's Motion For Summary Judgment (Doc. # 8) filed September 16, 2001. For reasons set forth below, plaintiff's motion is sustained.

### Procedural Background

On January 4, 1994, plaintiff filed an application for disability insurance benefits, claiming that he had been disabled since December 31, 1992 and was entitled to benefits until he reached the age of 65 on September 19, 1997.[2] See Certified Transcript Of The Record ("Tr.") at 36 in Answer (Doc. # 2) filed July 2, 2001. Plaintiff's proffered disability was a non-treatable and non-correctable hearing defi-

---

**2.** Plaintiff had previously filed an application for disability insurance benefits on January 27, 1993, alleging that he had been unable to work since December 31, 1992. Tr. 26, 236. Plaintiff's application was denied initially and, on June 15, 1993, benefits were denied upon reconsideration. Tr. 26, 241–243. Plaintiff did not further pursue this application.

In addition to applying for disability benefits, plaintiff on January 7, 1994 discussed his eligibility for Supplemental Security Income ("SSI") with Norm Franker, a branch manag-

er for the Department of Health and Human Services. Tr. 46–47. Franker reached an informal determination that plaintiff would not be eligible for SSI because he and his spouse had resources of at least $10,000, which was more than the limit of $3,000 for SSI. Tr. 46. On April 12, 1994, plaintiff requested reconsideration of this determination. Tr. 50. On May 31, 1994, Franker again found that if plaintiff formally applied, he would not be eligible for benefits. Tr. 48–49. Plaintiff apparently did not pursue this claim or request a hearing on this matter.

ciency. *Id.* Plaintiff's claim was denied initially and upon reconsideration, so on August 12, 1994, he timely requested a hearing regarding his disability application. Tr. 66. On January 19, 1996, Administrative Law Judge Jack R. Reed ("the ALJ") notified plaintiff that his hearing would be held February 6, 1996. On April 15, 1996, after the hearing, the ALJ issued a written order which denied plaintiff's application for benefits. Tr. 26–34. On June 19, 1998, the Appeals Council affirmed the denial. Tr. 3. Plaintiff then appealed to this Court, which on April 21, 1999 remanded the case to the ALJ for a supplemental hearing to consider whether plaintiff could perform his past relevant work as an insurance agent. Tr. 397. Specifically, the Court found that the ALJ had not determined the amount of time that plaintiff's previous job required him to work in noisy environments and converse with several individuals simultaneously or how frequently such activity was demanded of insurance agents in the national economy. Tr. 412–13. The Court found that plaintiff's other asserted errors were without merit. Tr. 413–14. On May 23, 2000, the ALJ held a hearing and again denied plaintiff's claim. Tr. 296. The Appeals Council denied plaintiff's request for review.

**Factual Background**

The following evidence was presented to the ALJ.

Plaintiff was born on September 18, 1932. He was 63 years of age at the time of the first administrative hearing and 67 years old at the second. Tr. 251. He received a Bachelor of Science degree from Baker University in 1954. Tr. 235, 252. From September 1964 to December 31, 1992, plaintiff worked as an insurance agent for Calvin, Eddy and Kappelman, Inc., an insurance company that he jointly owned. Tr. 228. Plaintiff was earning more than $100,000 a year when he retired. Tr. 235. Plaintiff described his job as selling and servicing insurance products and designing proper coverage to meet the needs of his clients. Tr. 235.

## I. Medical History

Plaintiff has been diagnosed with bilateral sensorineural deafness with lack of discrimination and inability to communicate confidently. His disability prevents clear discrimination of speech, especially in a crowded room or on a telephone. Tr. 204–06. In addition to his hearing problems, plaintiff has suffered various other ailments. In particular, plaintiff has suffered cardiac problems,[3] an occasional kidney stone,[4] a hiatal hernia,[5] arthritis in his

---

**3.** During an examination on August 28, 1989, plaintiff had high cholesterol and glucose readings. Tr. 127–28. In late June of 1990, plaintiff had a ambulatory ECG report that revealed 10 premature supraventricular beats and 77 premature ventricular ectopics. Tr. 134. Dr. Gray concluded that plaintiff had occasional premature ventricular contractions stemming from one heart cell without runs or coupling. Tr. 134. On June 27, 1990, plaintiff returned to Dr. Gray to complain of dizziness he had experienced two weeks earlier. Tr. 129. Tests did not reveal any abnormalities. Tr. 130. On February 15, 1994, plaintiff had an annual checkup with Dr. Barr. Tr. 164. Aside from tenderness in his elbows during golf games, plaintiff did not have any new problems to report. *Id.* A cholesterol screen did reveal that plaintiff had

high cholesterol (249 mg.) and high low density cholesterol (163 mg.). Tr. 169.

**4.** On October 15, 1990, plaintiff spent one night at Lawrence Memorial Hospital with intense back pain due to a right ureteral stone that passed within 24 hours. Tr. 143. The hospital report revealed that plaintiff had previously suffered from a kidney stone. Tr. 144. Plaintiff was admitted to the hospital for an overnight stay due to the intensity of his pain. Tr. 145. On November 15, 1990, plaintiff returned to Dr. Gray—apparently for a return checkup that did not reveal any significant problems. Tr. 135.

**5.** Plaintiff first complained of dysphagia (difficulty swallowing) in 1992 during a check-up with Dr. Barr. Tr. 132. He did not have

feet,[6] occasional problems with snoring,[7] the beginnings of an inguinal hernia[8] and poison ivy.[9] At the administrative hearing on February 6, 1996, however, plaintiff conceded that it was the hearing loss (and not these other problems) that prevented him from working. Tr. 257. Therefore, although the Court has summarized these other ailments to complete the record, it will not consider the additional impairments which plaintiff now proffers as conditions which prevented him working. Plaintiff's impairment is nonexertional, although he alleges that it severely limits his capacity to perform substantial gainful activity at all levels.

Plaintiff first sought medical attention for his hearing loss on October 25, 1983. Tr. 96. Audiological testing revealed mild to moderately severe hearing loss in both ears. *Id.* On November 27, 1984, audiological testing at the Marston Hearing Center revealed 76 per cent speech discrimination in the right ear and 96 per cent speech discrimination in the left ear. Tr. 97. An evaluation on November 19, 1985 revealed the same condition and around that time, plaintiff began wearing hearing aids in both ears. Tr. 99. An audiological examination on October 28, 1998, revealed 68 per cent speech discrimination in the right ear and 95 per cent discrimination in the left ear. Tr. 182. Nonetheless, the hearing

fever, chills or night sweats or headaches and blurry vision. *Id.* Due to plaintiff's difficulty swallowing, Dr. Barr scheduled an upper gastrointestinal tract endoscopy. *Id.* On August 24, 1992, plaintiff returned to Dr. Barr for his upper GI results. Tr. 133. The test revealed a sliding hiatal hernia with a Schatzki's ring (a narrow ring of tissue at the lower end of the esophagus). Tr. 133, 140. Dr. Barr suggested that plaintiff see Dr. Teresa King to have an endoscopy or dilation of the Schatzki's ring. Tr. 133, 140–41. On August 28, 1992, Dr. King diagnosed plaintiff with severe acute esophagitis (most likely secondary to gastroesophageal reflux disease), a Schatzki's ring and a moderately large hiatal hernia. Tr. 152–53. On November 20, 1992, plaintiff had a follow-up visit with Dr. King which did not reveal any other abnormalities. Tr. 154–55. A biopsy of cells from the affected areas showed acute and chronic inflammation, but the cells were benign. Tr. 156. On this date, Dr. King successfully dilated plaintiff's esophagus to alleviate his symptoms. Tr. 159–60. At that time, plaintiff began taking Zantac twice daily for his hernia. Tr. 89. Dr. King opined that plaintiff should have a Maloney dilation every six months to prevent difficulty in swallowing. Tr. 161. Dr. Barr agreed with this assessment. Tr. 170. Plaintiff returned to Dr. King for esophageal dilations on March 4, 1994 and July 15, 1994. Tr. 159–60, 177. On July 15, 1994, Dr. King successfully dilated plaintiff's esophagus with a size 46 French dilator, but plaintiff was unable to tolerate a larger size. Tr. 178. On January 2,

1996, plaintiff successfully underwent another dilation with Dr. King. Tr. 219.

6. On December 5, 1995, plaintiff visited Dr. Ken Wertzberger regarding pain in the toes of his right foot. Tr. 216. X-rays revealed some arthritic changes in both feet and Dr. Wertzberger recommended bone scans to assess the health of the toe joints. *Id.* On January 15, 1996, Dr. Wertzberger discussed the results with plaintiff. Tr. 217. The bone scan revealed that plaintiff's left foot was actually more affected by the arthritis, but plaintiff commented that he had not suffered any more painful episodes since his initial visit to Dr. Wertzberger. *Id.* Plaintiff and Dr. Wertzberger agreed that plaintiff would continue monitoring the situation for any changes, but they would not take other action at that time. *Id.*

7. On December 18, 1995, plaintiff visited a doctor to complain of snoring problems. Tr. 223. The doctor found that an elongated soft palate and use of alcoholic beverages before bedtime led to plaintiff's snoring habit. *Id.*

8. On January 8, 1996, plaintiff visited Dr. Barr for an annual checkup. Tr. 211. Dr. Barr found a small left inguinal hernia that did not warrant treatment at the time, but he cautioned plaintiff to observe any changes in the area. *Id.*

9. On July 24, 1998, plaintiff visited Dr. Barr to receive treatment for poison ivy. Tr. 212.

aids apparently corrected plaintiff's hearing problem until August 28, 1989, when plaintiff ·complained of problems to Dr. Captain K. Gray during an annual examination.[10]  Tr. 146.

As the years progressed, plaintiff's hearing loss became more pronounced. On July 21, 1992, plaintiff returned to the Marston Hearing Center for an audiological evaluation. Tr. 101. Plaintiff reported that his right hearing aid had never worked as well as his left one. *Id.* Dr. L.E. Marston noted a discrimination ability difference between plaintiff's ears that may have been the cause of the problem. *Id.* Testing revealed 58 per cent speech discrimination in plaintiff's right ear and 88 per cent in his left ear. Tr. 102. Dr. Marston referred plaintiff to Dr. Stephen L. Segebrecht, an otolaryngologist. Tr. 101.

On July 24, 1992, Dr. Segebrecht examined plaintiff and testing revealed more of a deterioration in plaintiff's speech discrimination. Tr. 103, 189. Dr. Sebebrecht referred plaintiff back to the Marston Hearing Center for tympanograms on July 31, 1992. Tr. 105. The tests apparently did not reveal any abnormalities and the clinician recommended that plaintiff have an otological follow-up. Tr. 105, 184. Dr. Segebrecht thereafter referred plaintiff to Dr. Jon F. Barr for a physical examination to determine whether any physical ailments were causing his hearing difficulties. Tr. 131. Dr. Barr conducted a check-up,

VDRL and chemistry profile. Tr. 132, 136. The physical examination did not reveal any severe problems that would affect plaintiff's hearing.[11]

On August 14, 1992, plaintiff returned to the Marston Hearing Center. Tr. 106. The clinician noted that plaintiff's responses to acoustic click stimuli were within normal limits, but that wave morphology was poor in the right ear and that horizontal recording to improve the right ear early waves was not successful. Tr. 106, 185. On September 25, 1992, plaintiff had another set of hearing tests. Tr. 113. During two tests of plaintiff's hearing while using an aid, the clinician found 84 per cent and 82 per cent discrimination at 45 PL in plaintiff's right ear.[12]  Tr. 113.

In a letter dated October 23, 1992, the clinician indicated that plaintiff had slight to severe sensorineural precipitous hearing loss, slightly worse in his left ear. Tr. 114. Her evaluation revealed 58 per cent speech discrimination in the right ear and 88 per cent speech discrimination in the left ear. *Id.* She interpreted speech scores as indicating "poor and slight discrimination abilities for the right and left ear, respectively." *Id.* The clinician stated that plaintiff's unaided speech discrimination abilities in quiet were poor for the right ear and mildly impaired for the left ear and she also noted that he had experienced a 32 per cent decrease in his discrimination abilities in his right ear since 1983. *Id.* The clinician described plaintiff's binaural

10.  Plaintiff also noted a feeling of tension and pressure in his head which occurred primarily in stressful times, but his complaint does not appear to be related to his hearing problem. Tr. 146.

11.  The doctor did note that plaintiff had a history of cardiac disease. Tr. 132. A chest x-ray revealed lower field changes consistent with emphysema, but otherwise it was normal. Tr. 139. The cardiac silhouette was normal with no acute masses or infiltrate. *Id.*

Bullae were noted in the posterior lung fields on the lateral view. *Id.* Also, on August 18, 1992, Dr. Segenbrecht ordered an MRI to determine if there were any other explanations for plaintiff's hearing loss. Tr. 124. The MRI results were normal, but the radiologist noted that plaintiff had mild edema of the right nasal turbinates and maxillary antrum. Tr. 124, 186.

12.  The record does not reveal any test results for plaintiff's left ear.

aided sound field discrimination abilities to be mildly impaired at conversational speech levels in quiet. *Id.* Sykes added that due to environmental background noise and frequency range of most telephone systems, plaintiff's discrimination abilities could be further impaired. *Id.*

Plaintiff saw Dr. Segebrecht for follow-up visits on April 1, April 21 and November 22, 1993. Tr. 188. Dr. Segebrecht noted that plaintiff had a history of sensorineural hearing loss which was corrected with hearing aids. *Id.*

On January 14, 1994, plaintiff returned to the Marston Hearing Center. There, a clinician found that he had bilateral progressive precipitous sensorineural hearing loss which was more severe in the right ear. The clinician stated that plaintiff suffered a 43.1 per cent impairment for the right ear and 30 per cent impairment for the left ear. Tr. 117. Without hearing aids, plaintiff could not be expected to hear the mid to high frequency consonant sounds of speech which convey most conversation. *Id.* Although the amount of necessary loudness could be provided by amplification through hearing aids, there were no guarantees that speech would always be understood due to uncontrollable factors such as number of speakers, background noise, rate of speech and telephone systems. *Id.* She concluded that such impairments could affect plaintiff's work ability whenever hearing speech or environmental sound was required. *Id.*

On March 2, 1994, a clinician at the Marston Hearing Center performed audiological testing on plaintiff at the request of Kansas Disability Determination and Rehabilitation Services. Tr. 118. This testing revealed 60 per cent speech discrimination in the right ear and 72 per cent discrimination in the left ear. Tr. 120. This testing was interpreted as revealing slight to profound bilateral progressive precipitous sensorineural hearing loss with moderately impaired discrimination abilities, poorer in the right ear. Tr. 118. Plaintiff had a 47 per cent impairment of the right ear and 39 per cent impairment of the left ear. *Id.* He had a total biaural hearing handicap of 41 per cent. *Id.* The clinician noted that hearing aids would not guarantee the elimination of unwanted sounds and might amplify background noise. Tr. 119. She did note, however, that plaintiff's aided discrimination abilities in quiet were improved to only a mild impairment. Tr. 118.

In May of 1994, a doctor performed a residual physical function capacity assessment on plaintiff.[13] Tr. 53–60. The doctor found that plaintiff did not have any exertional, postural, manipulative or visual limitations. Tr. 54–56. In terms of communicative limitations, the doctor found that plaintiff was limited in hearing and could not hear well in a noisy environment. Tr. 57. Aside from avoiding concentrated exposure to noise, the doctor did not find that plaintiff had any environmental limitations.[14] Tr. 57.

Between June of 1994 and June of 1995, plaintiff saw Dr. Segenbrecht for three regular hearing examinations. Tr. 187. During these visits, Dr. Segenbrecht noted that plaintiff's hearing was corrected with hearing aids. *Id.* On August 2, 1994, plaintiff saw the Marston clinician so that she could program new hearing aids. Tr. 92. Plaintiff asserted that the clinician's efforts met with limited success. *Id.* On

---

**13.** The record is not legible as to the exact date of this document.

**14.** The form which the doctor utilized provided four possible assessments of environmental limitations: unlimited, avoid concentrated exposure, avoid even moderate exposure and avoid all exposure. The Court notes that the doctor chose the mildest type of limitation—avoiding concentrated exposure. Tr. 57.

August 14, 1995, Cassandra L. Colville, a clinical audiologist, completed a summary report of plaintiff's treatment at the Marston Hearing Center. Tr. 201. Colville noted that plaintiff appeared "to be using his multiple memory hearing aids efficiently." Id. Plaintiff told her that he was doing better in noisy environments and was utilizing a greater range of the aids' flexibility. Id. Colville stated that plaintiff had derived a "significant benefit" from his hearing aids. Id.

On November 27, 1995, Dr. Yong W. Kim conducted a consultative evaluation of plaintiff. Tr. 202. Plaintiff reported that he used to be a partner in an insurance agency, but was unable to carry on in that position due to his progressively worsening hearing problem. Tr. 202–03. Specifically, his inability to correctly understand telephone conversations caused him to lose confidence in his ability to perform his work. Tr. 203. Dr. Kim's diagnostic impression was that plaintiff had "apparently severe hearing defect, sensory neural deafness." Id. Dr. Kim described plaintiff's condition as a typical sensory neural deafness with otosclerosis bilaterally. Id. Physical examination revealed slerotic, hard grayish tympanic membrane in both ears and Dr. Kim believed that plaintiff had read his lips during the evaluation. Tr. 202. Dr. Kim reported that plaintiff stated that he had no difficulty in a quiet surrounding on a one to one basis, but plaintiff did have continued difficulty with discrimination of words even with a hear-

ing aid and that plaintiff was often unable to converse with his customers on the telephone or with a person in a crowd due to his inability to understand correctly. Tr. 202. Dr. Kim also performed a medical assessment of plaintiff's abilities to engage in work-related activities. Tr. 204–06. Dr. Kim found that plaintiff could not communicate confidently and had a lack of discrimination during telephone conversations and when speaking with more than one person at a time. Tr. 206.

On January 8, 1996, Dr. Segenbrecht completed an attending physician statement and indicated that he had treated plaintiff since August 22, 1984. Tr. 222. He opined that plaintiff had been partially disabled from October 1983 to the present due to mild to severe sloping sensorineural hearing loss. Id. In a box which asked whether plaintiff was totally disabled, the doctor marked "N/A" but he noted that plaintiff had been partially disabled from October 1983 to the present. Id.

Although plaintiff has been examined by a doctor as recently as 1999, information gained in that visit is not relevant to the Court's discussion because plaintiff's eligibility for disability insurance benefits ended in 1997–when he reached retirement age.[15] Plaintiff's current daily medications are 500 mg. of acetaminophen, one multivitamin, 325 mg. of Ecotrin for cardiac care, 1000 units of Vitamin E, 20 mg. of Prilosec for hiatal hernia and ulcers, 20 mg. of Lipitor for cholesterol control, Vitamin B6

15. On October 4, 1999, Dr. Asghar Chaudhary examined plaintiff. Tr. 416. Dr. Chaudhary found that plaintiff had a history of bilateral hearing loss, mostly in the high tones, but that his speech was normal and that he could drive and carry on a conversation. Tr. 416–18. In a medical assessment form, Dr. Chaudhary found that plaintiff's ability to work was affected by his inability to communicate confidently, especially on the telephone and when talking to more than one person simultaneously. Tr. 421–22. On Octo-

ber 12, 1999, plaintiff was examined by Dr. Christen Moore and Dr. Gregory Ator at the University of Kansas Department of Otolaryngology. Tr. 423. They determined that plaintiff had 72 per cent discrimination in his right ear and 84 per cent discrimination in his left ear. Tr. 423–24. Plaintiff calls these results into question, but they are irrelevant to the Court's analysis because they are outside the time frame for which plaintiff requested benefits.

and B12 and folic acid supplements.[16] Tr. 435.

## II. Plaintiff's Application For Benefits And Administrative Hearing On February 6, 1994

On January 4, 1994, plaintiff filed the instant application for disability insurance benefits, claiming that he had been disabled since December 31, 1992 and was entitled to benefits until he reached the age of 65 on September 19, 1997. Tr. 36. Plaintiff's proffered disability was a nontreatable and non-correctable hearing deficiency. *Id.* Plaintiff's claim was denied initially and upon reconsideration, and on August 12, 1994, plaintiff timely filed a request for a hearing regarding his disability application.[17] Tr. 66. On January 19, 1996, the ALJ sent notice to plaintiff that his hearing would be held on February 6, 1996. Tr. 34. At the hearing on February 6, 1996, plaintiff testified that he also had back pain and esophageal , problems-although these ailments do not prevent him from working. Tr. 248. Plaintiff also testified about the type of work that he performed. Tr. 254. He stated that he spent roughly 25 to 30 per cent of his time out of the office visiting clients. Tr. 255. Plaintiff spent another 30 per cent of his time on the telephone with clients. Tr. 258.

At the administrative hearing, plaintiff also testified about his disability. Although plaintiff had a back problem due to an old football injury and arthritis in his feet, he stated that he could work in spite of those conditions. Tr. 256. Plaintiff also has a hiatal hernia, esophageal stricture and relatively minor foot problem, but these ailments are under control. Tr. 256–57. Plaintiff testified that if these were his only ailments, he would not consider himself unable to work. Tr. 257. Plaintiff's main problem was his hearing loss. He stated that he first became aware of his hearing problem in 1981 when he realized that he was not hearing well. Tr. 258. At that time, he tried hearing aids but they "drove [him] nuts." *Id.* Later, he realized that he did not have a choice and he was fitted with two hearing aids. *Id.* By 1992, he felt like he was not hearing as well as he had been and that he was not hearing everything in the office setting. Tr. 259.

---

**16.** As of January 8, 1996 (around the time of the first administrative hearing), plaintiff was taking 150 mg tablets of Zantac twice a day for his esophageal ulcers, Ecotrin to alleviate any cardiac problems, two 325 mg tablets of acetaminophen a day to relieve arthritic pain, Centrum A to Z and Gavison as needed to relieve discomfort from esophageal ulcers. Tr. 226.

**17.** On March 23, 1994, Janet Shivers, a disability examiner, determined that plaintiff's primary diagnosis was sensorineural hearing loss in both ears. Tr. 40. Also on that date, Margaret Foertschbeck, the Regional Commissioner for the state of Kansas, denied plaintiff's application. Tr. 41–45. In finding that plaintiff's medical condition was not severe enough to keep him from working, the Commissioner relied on a response from Dr. Stephen L. Segebrecht dated January 28, 1994 and January 19, 1994 and March 11, 1994 reports from Dr. Marston *Id.*

On April 2, 1994, plaintiff filed a motion for reconsideration of Foertschbeck's decision. Tr. 88. Plaintiff added to his list of ailments a hiatal hernia, a suspected cardiovascular problem and arthritis. Tr. 88. On July 19, 1994, Conrad Fisher, a disability examiner, added to plaintiff's claim a secondary diagnosis of hiatal hernia. Tr. 52. On July 21, 1994, Foertschbeck denied plaintiff's disability claim upon reconsideration. Tr. 61–65. She relied on responses from Drs. Jon F. Barr and Teresa King, both received on June 21, 1994. *Id.* Foertschbeck found that plaintiff's proffered disabilities of a hearing impairment, hiatal hernia, history of coronary artery disease and tendinitis were not severe enough to keep him from working. *Id.*

On August 3, 1994, plaintiff filed an addendum to his claim which stated that he saw Sykes on August 2, 1994 regarding programming his hearing aids. Tr. 92–93.

As an example, plaintiff testified that he constantly had to ask people to repeat things that they said to him-which did not inspire confidence on the part of clients. Tr. 262. His ability to hear was adversely affected by background noise such as computer printers. Tr. 264. He also had difficulty hearing when he spoke with more than one person. Tr. 264. In addition, his ability to conduct business on the phone was severely restricted, particularly when he dealt with people who had higher pitched voices, especially women. Tr. 265. At that time, however, plaintiff believed that if he heard what was spoken, he had correctly heard the words. Tr. 266.

Plaintiff testified that he decided that he could no longer function in his business when an

> audiological examination revealed that he misunderstood a number of words in a conversation that he thought that he correctly heard. Tr. 260. Plaintiff became afraid that he might be sued for malpractice for giving poor advice because of misunderstandings due to his hearing problem, particularly since he was now aware of the problem. Tr. 261. Plaintiff finished up that fiscal year by winding down his affairs, and he tried to limit his exposure to new matters. Tr. 262.

In response to a question from the ALJ, plaintiff testified that he did not think it would matter if his business was selling individual policies instead of more complicated business policies. Tr. 263. Plaintiff testified that he would still not be able to communicate well enough to properly put together policies. Tr. 264.

Virginia Ellis Eddy, plaintiff's wife of nine years, also testified at the administrative hearing. Tr. 268. She stated that in order for her husband to understand her when she spoke to him, she had to look at him and speak very distinctly. Tr. 269. Despite this, she often has to repeat herself and plaintiff sometimes answers her questions incorrectly because he misunderstands what she is saying. Id. Occasionally, she even has to spell out words for plaintiff. Tr. 271. Eddy stated that plaintiff heard low-pitched sounds much better and more accurately than high-pitched sounds such as women's voices. Tr. 270. She also testified that he never erased answering machine messages because he did not trust his ability to accurately take down phone numbers. Tr. 270. Eddy stated that plaintiff has difficulty understanding church sermons or information in a meeting unless he is in the front row and the speaker is talking in his direction. Tr. 272. Plaintiff cannot hear well enough to use airport telephones. Tr. 272–73. Plaintiff can attend musicals, but he cannot hear well enough to attend movies without earphones for the hearing impaired. Tr. 273. Plaintiff also has difficulty hearing in an automobile due to the fact that his hearing aids' amplify road noise. Tr. 274. He cannot understand anything said in the back seat if he is in the front. Id. In response to the ALJ's questioning about plaintiff's abilities on the telephone, Eddy testified that plaintiff had to speak on a speaker phone with the volume all the way up and that he still did not always understand the conversation. Tr. 272. Plaintiff testified that all of her testimony was based on interactions when plaintiff was wearing his hearing aids. Tr. 270.

The ALJ retained Dan Goldstein to testify as a vocational expert at the administrative hearing on February 1996. Tr. 275. He stated that plaintiff's work as an insurance agent and partner in a general insurance company constituted light and skilled labor. Tr. 276. According to Goldstein, plaintiff's hearing would be a very significant factor in this occupation because it involved a high level and high degree of communication. Id. He testified, however, that the hearing problem would

not impact plaintiff's problem-solving or analytical abilities regarding assessments of insurance coverage. *Id.* Goldstein testified that if he accepted the testimony of plaintiff and his wife as essentially correct, plaintiff could not perform his past relevant work as an insurance agent. Tr. 277.

On April 15, 1996, the ALJ issued a written order denying plaintiff's application for benefits. Tr. 26–33. The ALJ found that plaintiff's impairment imposed significant limitation on his ability to function in the workplace and thus he had a "severe impairment." Tr. 27. Nonetheless, the ALJ found that plaintiff's impairment did not meet the criteria necessary for benefits and that he could perform his past relevant work. Tr. 32.

On May 7, 1996, plaintiff filed a petition for review of the ALJ's decision. The Appeals Council denied plaintiff's request for review on June 19, 1998.[18] Plaintiff then appealed to this Court. On April 21, 1999, the Court remanded the case to the ALJ for a supplemental hearing to consider whether plaintiff could perform his past relevant work as an insurance agent. Specifically, the Court found that the ALJ had failed to determine on the record the amount of time that plaintiff's previous job required him to work in noisy environments and converse with several individuals simultaneously or how frequently such activity was demanded of insurance agents in the national economy. Tr. 412–13. The Court found that plaintiff's other asserted errors were without merit. Tr. 413–14.

## III. Supplemental Hearing

On May 23, 2000, the ALJ held a supplemental hearing, pursuant to the Court's order. Tr. 316. The ALJ specifically noted that he was instructed to examine the hearing-related needs of plaintiff's past relevant work. Tr. 340. Plaintiff and his wife both testified, generally in conformity with their testimony of February 6, 1999. Tr. 320–325, 346–50. In addition, plaintiff testified that he spent 60 percent of his work day communicating with people, 40 per cent of which was outside the office.[19] Tr. 325–26. In response to the ALJ's question, plaintiff replied that he was unaware of any mistake he had made in writing or establishing policies. Tr. 328. Roughly 35 per cent of plaintiff's business involved insurance for individuals, while the remaining policies were commercial and business insurance. Tr. 332. Plaintiff testified that using a speaker phone allowed him to communicate with clients, although he had to ask them to repeat themselves three or four times during the conversation. Tr. 335–36.

Two vocational experts testified at the hearing. The first, Bud Langston, testified that communication was imperative to perform the job of insurance agent. Tr. 356. He also testified that most of this communication occurred via telephone. *Id.* Langston concluded that someone described as plaintiff would not meet the requirements of performing a job as an insurance agent as it is generally performed in the national economy. Tr. 360 61. The ALJ then posed the following hypothetical to Langston:

18. In his written appeal dated March 3, 1998, plaintiff alleged that the ALJ failed to consider all of the record evidence regarding his hearing impairment, failed to consider the testimony of the vocational expert who testified at the hearing, did not properly assess the credibility of plaintiff and his spouse, failed to give appropriate weight to the opinions of the treating physician, erred in finding that plain-

tiff could perform his past relevant work and inappropriately substituted his opinion for that of the medical and vocational experts. Tr. 12.

19. Plaintiff had previously testified that 30 percent of his time was spent outside the office.

Now let us assume that I had an individual such as this claimant with the aid and assistance of bilateral, hearing aid devices and is able to hear and understand telephone conversations with clients, working in his own office where, who'd have only limited distractions from other employees. To what extent do you see problems with dealing with clients over the telephone, even though there may well be some hearing loss? Tr. 366–67. Langston replied that such an individual would not have a problem if he had few interruptions and little background noise. Tr. 367. In response to the ALJ's questions, Langston concluded that plaintiff could transfer his skills to a simpler kind of insurance job, given the above working conditions. Tr. 367. The other vocational expert, Richard Sherman, testified that an individual with significant hearing loss would be significantly impaired in performing the position of insurance agent. Tr. 373. Sherman testified, however, that most insurance agents have secretaries or receptionists who handle the majority of incoming calls. Tr. 383. In addition, Sherman testified that plaintiff would have a much higher rate of accuracy working on individual one-on-one insurance claims as opposed to commercial transactions. Tr. 384.

On July 28, 2000, the ALJ denied plaintiff's claim. Tr. 293. In his order of July 28, 2000, the ALJ made the following findings:

1. The reconsideration determination dated June 15, 1993 is not reopened.

2. Claimant met the earnings requirements of Title II of the Act on December 31, 1992, the date he stated he became unable to work, and he continued to meet them through his attainment of full retirement age (65) on September 18, 1997.

3. Claimant has not engaged in substantial gainful activity since December 31, 1992.

4. During the period in question, claimant had "a single impairment, bilateral sensorineural hearing loss, which affects his ability to return to his past relevant work as an insurance agent."

5. During the period in question, claimant did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

6. During the period in question, claimant had the residual functional capacity to perform work-related activities at all exertional levels; but due to his hearing impairment, he required the use of hearing aids, a speaker telephone, limited background noise, and generally one on one communication.

7. Claimant has not met his burden of proving that, as a result of his partial, bilateral sensorineural hearing loss, he would have been unable to earn or be worth $6,000.00 annually as an owner/partner/agent in his insurance agency during the period in question, from December 31, 1992 to his attainment of age 65 on September 18, 1997.[20]

8. Claimant was not under a disability from December 31, 1992 to his attainment of age 65 on September 18, 1997. Tr. 314–15.

On December 20, 2000, plaintiff appealed the ALJ's decision, arguing that he had

---

**20.** The ALJ based this finding on his interpretation of the requirements of step four of the disability analysis. This step requires the ALJ to determine whether plaintiff can still perform his prior relevant employment even with his impairments. The ALJ interpreted this analysis to mean that plaintiff must show that he cannot perform any significant portion of his prior relevant employment. The ALJ defined significant as work activity that earns more than $500 a month or $6,000 per year.

erred in (1) assessing plaintiff's burden of proof; (2) finding that plaintiff could perform sufficient gainful activity to earn $6,000 annually; (3) considering plaintiff's insurance renewal as earnings when plaintiff no longer rendered significant service to his company; and (4) failing to find that plaintiff was disabled for the five year period in question. Nonetheless, the Appeals Council affirmed the ALJ's denial of benefits. Tr. 282–84.

On May 4, 2001, plaintiff filed a claim for relief with the Court. He alleges that (1) the ALJ erred in determining who bore the burden of proof; (2) the ALJ did not meet his step five burden; and (3) the ALJ erred in applying the law of the case.

## Standard Of Review

The ALJ's decision is binding on the Court if supported by substantial evidence. See 42 U.S.C. § 405(g); *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. See *Castellano v. Sec'y of HHS*, 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985) (citation omitted).

## Analysis

■■■ Plaintiff bears the burden of proving disability under the SSA. See *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. See 42 U.S.C.A. § 423(d)(1)(A) (1996). To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. 20 C.F.R. §§ 404.1520, 416.920 (1996). If a claimant satisfies steps one, two and three, he will automatically be found disabled; if a claimant satisfies steps one and two, but not three, then he must satisfy step four. If step four is satisfied, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. See *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988).

The ALJ found that plaintiff met steps one and two of the disability analysis, but that plaintiff did not meet step three since plaintiff did not have an impairment or combination of impairments meeting or equaling the level of severity of any impairment described in Appendix 1, Subpart P, 20 C.F.R. 404.[21] Tr. 303.

■■■ Step four of the sequential analysis is comprised of three phases. See *Winfrey*

---

**21.** In order for hearing loss to meet the disability requirements, plaintiff must show either an average hearing threshold sensitivity of 90 decibels or greater or speech discrimination scores of 40 per cent or less in the better ear. Tr. 303. None of plaintiff's medical evidence indicated that he could meet this bar. *Id.*

*v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must evaluate plaintiff's physical and mental residual functional capacity (RFC). *Id.* (citations omitted). In the second phase, the ALJ must determine the physical and mental demands of plaintiff's past relevant work. *Id.* (citing 20 C.F.R. § 404.1520(e)). Last, the ALJ determines whether plaintiff has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. *Id.* (citations omitted). At each of these phases, the ALJ must make specific findings. See *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir.1993).

Under the first prong, the ALJ found that plaintiff's hearing loss was the only disability at issue and that plaintiff had to use hearing aids and a speaker phone, limit background noise and try to converse one on·one.[22] Tr. 307.

Under the second prong, the ALJ found that plaintiff's testimony regarding his working environment was credible. In particular, plaintiff (and the vocational experts) testified that communication was one of the most important aspects of plaintiff's work. Plaintiff testified that one person at a time typically talked during his meetings with multiple people and that roughly 30 per cent of the time he would be involved in conversations with background noise. Tr. 309–10. In addition, plaintiff testified that 30 per cent of his time was spent talking on the telephone. Tr. 258. Plaintiff testified that 60 per cent of his time was spent outside the office talking with clients and about 20 per cent of that time he was in factories or other environments which hindered his ability to hear well. Tr. 344.

In the final prong of the step four analysis, the ALJ determined that plaintiff was able to perform his past relevant work to a level of substantial gainful activity. Tr. 313. In particular, the ALJ found that plaintiff was able to use hearing aids and a speaker phone and that he had the authority as the partial owner of his insurance agency to create a generally suitable (i.e. quiet) working environment for himself. Tr. 313. In addition, the ALJ observed that plaintiff was able to handle himself very well during the disability hearing—which resembled a meeting situation in that multiple people were present and there were frequent interjections by various people. Tr. 309–10. Finally, the ALJ found that plaintiff had not met his burden of showing that he did not have sufficient residual functioning capacity to perform his past relevant work to the level of substantially gainful activity. In 1992, the last year that plaintiff worked, he earned $55,500. The ALJ considered a monthly salary of $500 to be substantial gainful activity. Tr. 304. The ALJ believed that plaintiff could earn at least $500 a month in insurance renewals alone. Tr. 313. Also, plaintiff had testified that 35 per cent of his business was with personal accounts, and the ALJ thought that plaintiff could have continued to administer such accounts. Tr. 313.

In reaching the determination that plaintiff did not fulfill his step four burden, the ALJ determined that Langston's testimony was not credible since he appeared to be more of an advocate for plaintiff than an impartial expert. The ALJ found the testimony of plaintiff and his wife, however, to be substantially credible. Tr. 305–06. Plaintiff had testified that his impairment had severely restricted his ability to

---

**22.** The ALJ's findings up to this point followed his prior analysis, which the Court had agreed with and not called into question.

conduct business on the phone, that he had a great deal of difficulty with background noise and that he constantly had to ask people to repeat themselves. Tr. 262–65. Plaintiff testified that he had these difficulties despite using his hearing aids and a speaker phone.

The ALJ denied benefits at step four. Thus he did not reach step five of the analysis.

## I. Step Four

Plaintiff first argues that the ALJ used an improper burden of proof in step four of the disability analysis. Plaintiff initially carries the burden of proof in showing that he is disabled and, if he can show at step four that he is unable to perform work which he has done in the past either as he has done it or as it is performed in the national economy, he establishes a prima facie case of disability. See *Taylor v. Callahan*, 969 F.Supp. 664, 668 (D.Kan.1997) (citing *Williams*, 844 F.2d at 751).

### A. Burden Of Proof

In this case, the ALJ found that plaintiff could perform *his* past relevant work-not his work as performed in the national economy.[23] In concluding that plaintiff could perform his past relevant work, the ALJ relied on evidence that plaintiff could earn at least $6,000 annually by performing a limited range of his prior occupational duties. Plaintiff asserts that the ALJ's legal standard assumes that he could have prorated his work and been paid accordingly—regardless of how his limitations impacted his ability to do the other requirements of his job. See Memorandum In Support Of Plaintiff's Claim For Relief

(Doc. # 7) filed September 16, 2001 at 10. In particular, the ALJ solicited no evidence to support his opinion that plaintiff's partners would have paid him at least $6,000 annually to perform some function of his job.

While plaintiff bears the burden of showing that he cannot perform his past relevant work, he does not bear the burden of showing that he cannot perform any part of his previous job duties. The ALJ apparently deconstructed plaintiff's job into arguable component parts and then came up with an entirely new set of responsibilities that he believed plaintiff could perform. An imaginary job that the ALJ constructs is not plaintiff's past relevant work and it is not plaintiff's burden at step four to show that he cannot perform any work at all. The law does not support the ALJ's analysis.

### B. Plaintiff's Ability To Perform His Past Relevant Work As He Performed It

Plaintiff argues that he presented sufficient evidence (through his testimony and that of his spouse and the vocational experts, along with evidence from his treating physicians and the medical clinicians) to meet his burden of showing that he could not perform his past relevant work. Plaintiff, whom the ALJ found credible, testified that he could not perform his past relevant work. Tr. 325. The vocational experts did not testify that plaintiff could return to his past relevant work.

Despite the ALJ's failure to properly allocate the burden of proof, the Commissioner argues that the ALJ adequately determined that plaintiff could return to

---

**23.** The ALJ focused on plaintiff's past relevant work as he actually performed it for two reasons. Tr. 308–09. First, plaintiff would have the benefits of ownership prerogatives in his own insurance agency and the best chance

of performing his work to the level of substantial gainful activity. Tr. 309. Second, plaintiff was the most credible witness in discussing how the insurance industry worked and the demands of his job. *Id.*

his past relevant work. First, the ALJ apparently believed that his suggested job modifications—hearing aids, a speaker phone, limited background noise and one-on-one conversation—would allow plaintiff to perform his job duties. In addition, the ALJ assumed that hearing aids, a speaker phone, limited background noise and one-on-one communication would allow plaintiff to communicate with clients. Tr. 367. Plaintiff's testimony, however, was that he had difficulty communicating over the phone and with his clients even with these aids. The ALJ found plaintiff's testimony credible. The record does not reveal any evidence to support a conclusion that these devices would adequately correct plaintiff's hearing problem. Substantial record evidence does not support a finding that plaintiff could have performed his past relevant work. See *Emory v. Sullivan,* 936 F.2d 1092, 1093 (10th Cir.1991) (ALJ erred in determining that claimant could return to past relevant work as carpenter; substantial evidence did not exist to show that ALJ's suggested protective devices would be effective against lung irritants).

Next, the Commissioner argues that plaintiff could perform his past relevant work as he performed it because the ALJ solicited testimony from the vocational experts that plaintiff's previous job skills were transferable to other insurance jobs. See Brief Of The Commissioner (Doc. # 9) filed October 18, 2001 at 7. As plaintiff points out, this testimony does not show that he could return to *his* past relevant work as he had performed it or that he could return to his job as it was performed in the national economy. See Plaintiff's Reply To Brief Of The Commissioner (Doc. # 10) filed October 30, 2001 at 2. The testimony of the vocational experts only indicated that plaintiff might have had transferable skills that would have allowed him to perform some job in the insurance industry—not his previous one. The ALJ stated that plaintiff could perform his own

past relevant work, but he did not find that plaintiff could actually perform his job as he had previously done it. He relied on the possibility that plaintiff could perform a portion of his previous work. No evidence, much less substantial evidence, supports a finding that plaintiff could perform his past relevant work as he had performed it.

## C. Plaintiff's Past Relevant Work As It Is Performed In The National Economy

The Commissioner does not argue that plaintiff could have performed his job as it was performed in the national economy and substantial record evidence does not support such a conclusion. In his questions to the vocational experts, the ALJ proposed that plaintiff would keep the benefits of ownership that he had in his previous work. Tr. 366–67. Indeed, the ALJ noted that if plaintiff was unable to met his job responsibilities in an environment that he could control, he would likely not be able to perform his previous job in the national economy. Substantial evidence, however, does not show that plaintiff could perform his previous relevant work as he had done it. Therefore substantial evidence does not exist to show that plaintiff could perform his past relevant work as it is done in the national economy.

In conclusion, the ALJ implicitly found that plaintiff could not return to his entire past relevant work, either as he performed it or as it was performed in the national economy. The ALJ committed error because he combined the perks of plaintiff's past relevant work as he had performed it and the purported requirements of plaintiff's work in the national economy in order to come up with a job which he felt plaintiff could perform. See *Winfrey,* 92 F.3d at 1025–26 (finding that plaintiff failed to meet step four burden reversed; evidence

showed that plaintiff could only fit in work-place of previous employer but that he could not perform job as he had done it, only as performed in national economy). Plaintiff therefore met his burden of proof at step four. Whether plaintiff could have still performed *some* kind of work is a step five, not step four, determination. The ALJ's statement that plaintiff bore the burden of proving he could not perform any significant portion of his work is clearly erroneous because plaintiff only bears the burden of showing that he could not perform his past relevant work. See *Williams,* 844 F.2d at 751. The ALJ erred by finding that plaintiff had not established his prima facie case.

## II. Plaintiff's Ability To Perform Jobs In The National Economy

█ Plaintiff next argues that the ALJ failed to meet his step five burden because he did not show that plaintiff possessed "highly marketable skills" which could transfer to other jobs in light of his advanced age. At step five, the ALJ must determine whether plaintiff has the residual capacity to perform other work in the national economy in view of his age, education and work experience. See *Bowen v. Yuckert,* 482 U.S. 137, 148, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). The ALJ bears the burden of proof at step five. See *id.* at 146 n. 5, 107 S.Ct. 2287. To meet this burden, the ALJ must find that plaintiff can perform work "in the claimant's residual functional capacity category." *Talbot v. Heckler,* 814 F.2d 1456, 1462 (10th Cir. 1987).

Although the ALJ erroneously placed on plaintiff the burden of proof at step five and mischaracterized it as a step four analysis, he did develop a record regarding the transferability of plaintiff's job skills and whether plaintiff could perform other work in the national economy, specifically other jobs in the insurance industry. Both vocational experts agreed that plaintiff had developed skills in his previous work that would aid him in a position of writing simple homeowner and automobile polices. The vocational experts also testified that plaintiff could perform this sort of work if he could hear and understand over the telephone and also had few interruptions and little background noise.

█ A careful examination of the record, however, reveals no discussion about the impact of plaintiff's advanced age on his ability to find other work in the national economy. This is significant because the ALJ must overcome a higher burden at step five to deny benefits to a plaintiff of advanced age. See *Nielson v. Sullivan,* 992 F.2d 1118, 1120 (10th Cir. 1993) (citing *Emory,* 936 F.2d at 1094). Plaintiff, who was 61 years old at the time he filed his application for benefits, is a person of advanced age pursuant to 20 C.F.R. § 404.1563. Under 20 C.F.R. § 404.1568(d)(4), "[i]f you are closely approaching retirement age (age 60–64) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." The record contains no testimony or evidence about the type of vocational training that plaintiff would require to begin writing a different sort of insurance policy.[24] A

---

24. It would not be wholly unreasonable for the Court to conclude that plaintiff would not require much vocational training to begin selling a different sort of insurance policy.

Substantial evidence, however, is not a mere conclusion. See *Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir.1990).

finding of transferability does not satisfy the Secretary's burden of finding little vocational adjustment. See *Nielson*, 992 F.2d at 1122. "When the transferability of skills arises with respect to a claimant of advanced age, the ALJ must present the vocational expert with a hypothetical that asks whether or not the skill is transferable with little or no vocational training or job orientation." *Id.* In this case, however, the ALJ did not make any findings whether plaintiff's skills were transferable to a different job with little or no vocational training or job orientation. Possibly the ALJ believed that plaintiff necessarily could find work in the insurance industry and that plaintiff's undisputed knowledge of that area meant that no vocational training or orientation would be required for a different position. While this conclusion is not implausible, it does not obviate the need for the ALJ to develop the record on this point. The ALJ clearly failed to do so here.

■■■ In addition, under the regulation which was in effect at the time plaintiff filed his application for benefits, plaintiff would not be considered able to adjust to sedentary or light work unless he had skills which were highly marketable. See 65 Fed.Reg. 17,994–01 (Apr. 6, 2000) (discussion of change in regulation language). Plaintiff's counsel began a discussion of this during the second administrative hearing and Langston testified that plaintiff's skills were not highly marketable. At this point, plaintiff's counsel and the ALJ embarked on a discussion of the meaning of the term "highly marketable skills." The record reveals that the ALJ found it difficult to believe that a person with 30 years of experience in an industry would not possess highly marketable skills. This comment reflects a misunderstanding of the phrase "highly marketable skills." Highly marketable skills are not merely skills developed through previous working experience that would be transferable to other jobs. See *Preslar v. Sec'y Of HHS*, 14 F.3d 1107, 1111–13 (6th Cir.1994). Highly marketable skills are those "which are acquired through specialized or extensive education, training or experience, and which make the claimant's age not a deterrent or even a consideration in the hiring process." *Id.* at 1113. Essentially highly marketable skills are those that would give an older employee an "edge" over younger potential employees. *Id.* A relevant consideration in this analysis is the "relative abundance of jobs in the economy requiring the skills as compared to the relative scarcity of persons possessing the necessary skills." *Id.* at 1112.

Ultimately, the ALJ's failure to make a finding "that [claimant's] skills are highly marketable forecloses the possibility of finding that substantial evidence supports the Secretary's decision." *Emory*, 936 F.2d at 1095 (quoting *Varley v. Sec'y Of HHS*, 820 F.2d 777, 781 (6th Cir.1987)). In light of the ALJ's failure to consider the effect of plaintiff's age as required by 20 C.F.R. § 404.1563, his finding that plaintiff could perform some insurance work in the national economy is not supported by substantial evidence.[25] The failure of the ALJ to follow the correct legal standard or to provide the Court with a sufficient basis to determine that the appropriate legal principles have been followed is grounds for

---

**25.** The Court recognizes that the ALJ would not have had to discuss the impact of plaintiff's age on his ability to work or the marketability of his skills if he had correctly found that plaintiff could have performed his past relevant work. These are both step five issues and the ALJ believed that he had overruled plaintiff's claim at step four. As the Court discussed above, however, the ALJ did not overrule plaintiff's claim at step four because he did not find that plaintiff could perform his past relevant work. Since the ALJ implicitly reached step five of the analysis, he necessarily had to address all the step five issues.

reversal.[26] See *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir.1984) (citation omitted).

### III. Remedy

█ Plaintiff filed his application in this case January 4, 1994—eight years ago. A remand at this juncture would require the ALJ to demonstrate that plaintiff's skills were "highly marketable." See *Nielson*, 992 F.2d at 1122 (citations omitted). Under these circumstances, the Court declines to remand for a further hearing. See *Allen v. Bowen*, 881 F.2d 37, 44 (3d Cir.1989) (where claimant established prima facie case of entitlement, record was fully developed, and Secretary failed to show good cause for failure to adduce relevant evidence, no reason to remand). The ALJ has had two chances to conduct a proper determination. In light of the ALJ's obvious failure to address the standards at step five, and consequently his failure to satisfy his burden of proof at step five and the protracted delay which has resulted from his disposition of the proceedings, the Court finds that the judgment of the ALJ should be reversed and remanded so that the ALJ can award benefits for the appropriate period. See *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir.1993) (remanding for award of benefits because of Commissioner's "patent failure" to meet step five burden of proof and long delay because of Commissioner's erroneous disposition); *Frey v. Bowen*, 816 F.2d 508, 518 (10th Cir.1987) (case remanded for immediate award of benefits; over six years had passed since claimant sought disability; the record had been fully and fairly developed and the record as whole supported conclusion that claimant was disabled); see also *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir.1998) (after eight years, time "to bring the charade to an end"); *Sisco v. U.S. Dept. of HHS*, 10 F.3d 739, 746 (10th Cir.1993) (remanding for award of benefits; SSA "is not entitled to adjudicate a case ad infinitum until it correctly applies the proper legal standard and gathers evidence to support its conclusion") (quotations and citations omitted). Remand for an immediate award of benefits also is appropriate because "additional fact finding would serve no useful purpose." *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir.1989) (citation omitted).

**IT IS THEREFORE ORDERED** that plaintiff's Motion For Summary Judgment (Doc. # 8) filed September 16, 2001 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that the Judgment of the ALJ is **REVERSED**. The case is **REMANDED** to the ALJ with directions to award benefits to plaintiff for the appropriate period.

---

26. Since the Court has determined that plaintiff's first two arguments merit reversal of the ALJ's decision to deny benefits, it is not necessary for the Court to address plaintiff's third argument—that the ALJ incorrectly applied the law of the case doctrine.