Donald R. FRAZEE, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

No. CIV.A.02–2247–KHV.

United States District Court, D. Kansas.

April 28, 2003.

Teresa M. Meagher, Law Office of Teresa M. Meagher, Leawood, KS, for Plaintiff.

Christina L. Medeiros, David D. Zimmerman, Office of U.S. Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

■ Donald R. Frazee brings suit under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's decision to deny disability benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401 et seq., and supplemental security income ("SSI") benefits under Title XVI of the SSA, 42 U.S.C. §§ 1381 et seq.[1] This matter is before the Court on *Plaintiff's Brief In Support Of Reversing The Administrative Decision Of Defendant* ("*Plaintiff's Brief*") (Doc. # 12) filed December 2, 2002, which the Court construes as a motion for judgment. For reasons stated below, the Court sustains plaintiff's motion.

## I. Procedural Background

On July 28 and September 17, 1993, plaintiff filed applications for disability insurance and SSI benefits. Tr. 56–58. Plaintiff claimed that he was disabled beginning January 1, 1991, because of an eye injury and depression. Tr. 28. On May 15, 1996, an Administrative Law Judge ("ALJ") found that plaintiff was not dis-

abled. Tr. 155–72. Plaintiff requested review by the Appeals Council,[2] which remanded the case to the ALJ for further findings. Tr. 197–99. On March 6, 2001, after a second hearing, the ALJ found that plaintiff was not disabled. Tr. 15–25. On March 7, 2002, nine years after plaintiff filed his initial applications, the Appeals Council denied plaintiff's request for review. Tr. 8–9.

## II. Facts

The following evidence was presented to the ALJ.

### A. Plaintiff's Testimony

Plaintiff was born on September 21, 1956. Tr. 282. At the time of the first hearing in 1996, he was 37 years old. When plaintiff was five years old, he injured his left eye with an ice pick. Tr. 284. The accident left him blind in his left eye. *Id.* Plaintiff dropped out of school in the ninth grade because he "was just having too many problems trying to read things and [he] was behind in all [his] grades." Tr. 283. Plaintiff stated that he knew how to read, but that he had other people read for him because he could not see the words. *Id.* Plaintiff testified that he could write a simple note or message if his eyes were not bothering him. Tr. 319. He stated that he could add and subtract "[t]o a certain extent." *Id.* When making a purchase, he could figure out the correct change if he took time to count the money "real carefully." *Id.* He had been shortchanged a few times. Tr. 319–20.

---

1. Two social security disability benefit programs are available: disability insurance for qualified individuals who paid social security taxes for the relevant period, and SSI for individuals who did not. The pertinent regulations are the same for both programs. *See Eads v. Sec'y of Dep't of HHS*, 983 F.2d 815, 816 (7th Cir.1993).

2. During the appeal, plaintiff's file was lost and reconstructed from the records of plaintiff's counsel and the SSA. Tr. 194–95. Some of the documents were not recovered. *See* Tr. 3–6.

Plaintiff testified that the vision in his right eye had worsened over the years. Tr. 303. Sometimes he experienced spots and blurriness in his right eye. "[I]t's like I'm seeing spots. Like somebody's put something on top of my eye and I'm trying to see around it. It's, that is real difficult for me." Tr. 302. This happened up to three or four times a week, but sometimes not for a whole week.[3] Tr. 303.

Plaintiff stated that he experienced headaches about four or five times a week. It felt "like a real gigantic migraine headache kind of but it's, basically it's right over or in the back of my good eye. And that's when it, it attacks me there and then it'll kind of like spread out and go to the left side. And it, it will stay there for a couple of days. Sometimes it will go away in four or five hours." Tr. 300. Aspirin helped to relieve the pain, but it took a while to work. Tr. 301. When plaintiff experienced a headache, his right eye quivered and he lost concentration and got "real nervous." Tr. 301. Plaintiff missed a lot of work because of headaches. *Id.*

Plaintiff said that he had difficulty remembering things. Tr. 299–300. He suffered several head injuries from a car wreck, a couple of motorcycle wrecks and his brother hitting him in the head with a hammer. Tr. 300. Plaintiff had noticed increased difficulty with concentration and memory since these injuries. *Id.*

Until his wife died in October of 1992, plaintiff was married for ten years.[4] Tr. 28. Plaintiff and his wife had a son. At the time of the first hearing, the son lived with his maternal grandparents, plaintiff's in-laws. Tr. 316. Since his wife died, plaintiff had not associated with many people. *Id.* Plaintiff did not visit friends or relatives, but his in-laws and his son visited him occasionally. *Id.* Plaintiff had re-

cently moved into a one-bedroom apartment with a roommate, but he could not remember the address. Tr. 8–9. For mail, he used his in-laws' address. Tr. 282. They read his mail for him because he could not see the words. *Id.* His roommate and in-laws helped him to understand and pay his bills. Tr. 316.

At home, plaintiff watched about two hours of television a day if his eye was in "good shape." Tr. 317. Otherwise, he listened to music and talked to his roommate. *Id.* Plaintiff sometimes went to the grocery store and out for a hamburger. Tr. 317–18. He enjoyed walking outside on cloudy days. Tr. 318. Plaintiff used to enjoy fishing, baseball, building models, basketball and hunting, but he no longer participated in those activities due to vision problems. Tr. 302.

Plaintiff has experienced problems with consuming too much alcohol. Tr. 311. At the time of the first hearing, he drank six to twelve beers five to six days per week to cope with frustration over vision problems and his wife's death. Tr. 312. Doctors had recommended that he attend Alcoholics Anonymous meetings, which had helped him quit drinking for two years in 1992–1993. Tr. 313. Plaintiff did not drink on the job, however, and he had never missed work because of drinking. Tr. 322.

From 1972 to 1989 and again from 1994 to 1996, plaintiff worked on and off at the Custom Carwash. Tr. 285, 287. The owner was a family friend who let plaintiff work as a favor to his family. Tr. 287. In the past, the owner had fired plaintiff and re-hired him at his father's request. Tr. 288. The owner gave plaintiff the option to work full time, but plaintiff chose not to do so. *Id.* Two days a week, plaintiff

---

3. Plaintiff did not state the duration of the spots and episodes of blurriness.

4. Plaintiff's wife died suddenly of an enlarged heart caused by medication. Tr. 320.

vacuumed cars. Three days a week, he detailed windows "and stuff up front." *Id.* Plaintiff drove cars in and out of the carwash, about eight to 15 feet, but the carwash did not let him drive cars on the line or in steam because of his poor vision. *Id.* Other than the carwash, plaintiff had not driven a car for about a year because of vision problems. Tr. 292.

Plaintiff usually missed work two to three days a week because of eye problems. Tr. 288. Working at the carwash exposed plaintiff's eyes to chemicals which caused him "a lot of grief" and "burn[ed] real bad." *Id.* The chemicals irritated his left eye and caused it to swell, but they bothered his right eye the most. *Id.* Plaintiff suffered a sharp pain that felt like "someone [stuck] hundreds of needles in the back of[his] good eye." Tr. 289. When his eyes bothered him, plaintiff used over-the-counter eye drops and remained inside, away from bright lights. Tr. 290. When his eye problems were severe, he could not concentrate. Tr. 293. Plaintiff did not take medication for the problems because he thought that doctors could not determine what to give him. Tr. 290. A long time ago, doctors prescribed medication which plaintiff could not afford. *Id.*

Plaintiff suffered several injuries while working at the carwash. Tr. 286. At the time of the first hearing, he wore a sling on his right arm due to a shoulder injury which had occurred the prior weekend.[5] Tr. 285–86, 307. Because of the injury, plaintiff was not working and did not know when he would return to work. Tr. 307. Plaintiff had previously fallen at the carwash and had to miss two weeks of work. Tr. 286. In addition, about 14 years earlier, plaintiff had injured his hand when a

customer drove away while plaintiff was pumping gas in the car. Tr. 286–87.

Plaintiff did not work at the carwash between 1990 and 1994. Tr. 295, 296, 308. Before 1994, plaintiff had tried to work as construction worker, gas pumper, painter, assembly worker and cook, but his eye problems prevented him from performing the jobs safely and/or effectively.[6] Tr. 296–97.

From June to October of 1994, plaintiff worked full time at the carwash. Tr. 305. In October, plaintiff argued with the manager because the manager kept forcing him to work around steam and the manager fired him. Tr. 294. Plaintiff always had difficulty controlling his temper, which sometimes interfered with his ability to work. He had "a bad habit of saying the wrong thing at the wrong time." Tr. 301.

Following his termination at the carwash, plaintiff worked for about three months at the Birdhouse putting seeds into sacks. Tr. 294, 306. He worked a couple of days a week for a few hours a day. Tr. 295. Due to poor vision, he spilled a lot of seeds. *Id.* He also had difficulty moving around inside the Birdhouse, and he kept bumping into and breaking glass figures. *Id.* The owners were lenient and did not make him pay for the damage. Plaintiff sensed that they were losing their patience, however, and he decided to quit because he could not afford to pay for the damage. *Id.*

After he left the Birdhouse, plaintiff did not work because of eye problems. Plaintiff believed that he could not concentrate at a job and that he might get hurt. Tr. 293. During 1995, he received welfare assistance but that ceased. Tr. 294. In September of 1995, plaintiff began working

---

**5.** Another employee had left a car in reverse and plaintiff injured himself while trying to flee from the rolling car. Tr. 286.

**6.** The record is unclear whether plaintiff tried these jobs between 1990 and 1994, or at other times before 1994.

at the carwash because he "just couldn't take the fact that [he] didn't have a home and [he] wasn't getting any, hardly any food and [he] didn't have any clothes. [He] basically lost everything [he owned.] And [he] just knew wintertime was coming and [he] knew that [he] wasn't going to make this year if [he] didn't do something about it." Tr. 293. Plaintiff continued working through the time of the first hearing in January of 1996. Tr. 307.

At the second hearing, on February 15, 2001, plaintiff was 44 years old. He used his sister's address to receive mail because she was the only one who could find him. Tr. 363–64. Plaintiff had been living at his father's apartment for the last year, helping to care for his father. *Id.* His father had just entered a nursing home, however, and plaintiff had received notice that he must vacate the property in three days. Tr. 363–64. Plaintiff did not know where he would live next. Tr. 364. Before he lived with his father, plaintiff had been homeless for about two years, living on the streets and in abandoned cars and in abandoned houses. Tr. 377–78.

Plaintiff did not work during 1999 or 2000. Tr. 366. Plaintiff had stopped working at the carwash because he was constantly getting hurt and getting chemicals in his eyes.[7] Tr. 380. Plaintiff had lost weight, due to lack of food, and his drinking had diminished to one or two cans of beer once a week. Tr. 365–66, 371. On an average day, plaintiff scavenged through dumpsters or sat in the house listing to music and playing Solitaire "every once in a while." Tr. 378. Plaintiff did not have any friends and he did not like to go outside on bright sunny days. *Id.*

At the second hearing, plaintiff said that he experienced headaches when he used

his eyes, and he suffered from eye pain and discharge. Tr. 374, 379–80. Sometimes plaintiff experienced headaches almost every day, and sometimes he went three or four days without a headache. Tr. 382. Bright light caused blurred vision for about an hour. Plaintiff stated that on some days, he could not concentrate because of depression, eye problems and/or headaches. Tr. 381–82. Plaintiff said that he would seek medical care for his eye pain and headaches if he had a medical card or medical insurance. Tr. 380.

**B. Testimony Of Plaintiff's Father–In Law**

At the first hearing, plaintiff's father-in-law, Richard Ortbal, testified to the following facts. Ortbal is the legal guardian of plaintiff's son. Tr. 323. Ortbal thinks that plaintiff should not work at the carwash because of eye problems. Ortbal has observed "a strange looking substance" excreting from plaintiff's eye after work. *Id.* Plaintiff kept rubbing the eye, saying that he could hardly see out of it. *Id.* Ortbal took plaintiff to an eye doctor who confirmed that plaintiff's eyes have deteriorated. Tr. 325. The doctor discussed the future possibility of replacing his blind eye with a glass eye and using a prismatic lens for his good eye, but indicated that these measures were not immediately necessary. *Id.*

**C. Medical Evidence**

In 1974, Dr. A.N. Lemoine, an ophthalmologist with the University of Kansas Medical Center ("KUMC"), examined plaintiff. Dr. Lemoine recommended surgery for a post-traumatic cataract on his left eye.[8] Dr. Lemoine found plaintiff's right eye unimpaired. Tr. 118–20. In 1981, Dr. Gerhard W. Cibis confirmed that

---

7. The record does not reflect when plaintiff stopped working at the carwash.

8. Although the record is not clear, it appears that plaintiff did not have the surgery.

plaintiff had normal vision in his right eye. Tr. 116. On October 25, 1990, Dr. John R. Taylor of Truman Medical Center ("TMC") examined plaintiff and concluded that he was blind in his left eye. As to the right eye, Dr. Taylor made unremarkable findings of some areas of atrophic cystic changes in the far periphery.[9] Tr. 114–15.

On July 27, 1993, plaintiff sought treatment at the University of Kansas Medical Center for eye discomfort and discharge, sensitivity to sunlight and seeing spots in his right eye. Tr. 122. The examiner observed a sticky, yellow substance matting plaintiff's right eye.[10] The examiner diagnosed choroidal nevus in the right eye,[11] chorioretinal degeneration without holes, breaks or tears,[12] and blepharitis.[13]

On November 3, 1993, Elaine A. Burke, Psy.D.,and David A. Miller, Ph.D., performed a consultative psychological evaluation. Tr. 123–27. Plaintiff reported several head injuries and dizziness at work. Plaintiff denied feeling depressed but reported problems with anger which had increased since his wife died. Drs. Burke and Miller made the following observations:

[Plaintiff's speech] was logical, fluent and goal directed. There was some lack of organization in his discussion, but he responded well to specific questions. There were no overt indications of a thought or mood disorder. He appeared to be well oriented. He appeared to have some difficulty with memory and recall of remote and fairly recent history. He has some difficulty with insight into his situation, as he underestimates the impact of his drinking and temper upon his situation. He also appears to have some difficulty with judgment as he reports that he should not drink as it significantly exacerbates his difficulty with vision and motor coordination, however, he reports drinking approximately a case per week. Level of intellectual functioning appears to be in the borderline range.

Tr. 125–26.

Drs. Burke and Miller made the following diagnostic impression: [14]

> Axis I: Dysthymia (300.40)
>
> · Alcohol Abuse (305.00)
>
> Axis II: [Rule Out] Personality Disorder Not Otherwise Specified (301.90)

**9.** "Atrophic" denotes a "wasting of tissues, organs, or the entire body, as from death and reabsorption of cells, diminished cellular proliferation, decreased cellular volume, pressure, ischemia, malnutrition, lessened function, or hormonal changes." *Stedman's Medical Dictionary* (26th ed.1995) at 165.

**10.** The name of the examiner is not legible. *See* Tr. 122.

**11.** "Choroidal" relates to the "middle vascular tunic of the eye lying between the retina and the sclera." *Stedman's Medical Dictionary* at 334. "Nevus" refers to a "circumscribed malformation of the skin." *Id.* at 1208.

**12.** "Chorioretinal" relates to the choroid coat of the eye and the retina. *Stedman's Medical Dictionary* at 334.

**13.** "Blepharitis" means inflammation of the eyelids. *Stedman's Medical Dictionary* at 211.

**14.** Mental health professionals use Axis I to report all the various mental disorders except for personality disorders and mental retardation; Axis II for personality disorders and mental retardation; Axis III for general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder; Axis IV for psychosocial and environmental problems that may affect the diagnosis, treatment and prognosis of mental disorders; and Axis V for the individual's global assessment of functioning ("GAF"). *See Diagnostic & Statistical Manual Of Mental Disorders ("DSM–IV")* (4th ed.1994) at 25–30.

Axis III: [Rule Out] Dementia Secondary to Multiple Head Injuries By History (294.10)

Tr. 126. They concluded that plaintiff would appear to be able to maintain adequate relationships with co-workers and supervisors in a low-stress environment. He would be able to understand and perform tasks in an approximately average amount of time, provided that they did not involve significant visual discrimination. He probably would be able to maintain his concentration over an eight-hour day with tasks that were varied and not cognitively demanding. It is recommended that he be seen for a neuropsychological evaluation in order to evaluate his attention and concentration, memory and problem-solving abilities. He would also benefit from an evaluation by a neurologist in order to further assess his tumor [behind his right eye] and to rule out the possibility of seizures. He might be assisted by some counseling in order to work with him on his difficulties with substance abuse, as well as anger management, depression and dealing with the death of his wife. He also would benefit from an evaluation by vocational rehabilitation and/or an organization that assists people with significant visual impairments with adaptation and job skills and placement.

Tr. 126–27.

On December 16, 1993, Dr. Taylor found a visual acuity of 20/30–2 in plaintiff's right eye without correction. Tr. 129. The Goldmann's device indicated marked constriction of visual fields in the right eye. *Id.* Dr. Taylor noted, however, that the Goldmann fields "did not correlate to [plaintiff's] confrontation fields, which [Dr. Taylor] felt were full in the right eye." *Id.* In other words, Dr. Taylor believed that plaintiff had better visual fields than those reflected by the Goldmann device. Tr.

128. Dr. Taylor diagnosed plaintiff with cobblestone degeneration and choroidal nevus in the right eye. Tr. 129. Dr. Taylor advised plaintiff to wear shatter-proof safety glasses to protect his right eye from injury. Tr. 130.

On September 8, 1994, Stephen S. Lile, O.D., examined plaintiff. Plaintiff complained of decreased acuity in his right eye and discomfort in his left eye with an occasional discharge. Tr. 138. Dr. Lile reported that plaintiff had "no habitual spectacle correction." *Id.* Dr. Lile found that plaintiff had 20/30 vision in his right eye which could be corrected to 20/25. Tr. 138. He recommended a spectacle correction with polycarbonate lenses. Tr. 139.

On July 7, 2000, Howard J. Birky, Ph.D., administered the Wechsler Adult Intelligence Scale–Third Edition ("WAIS–III") and the Minnesota Multiphasic Personality Inventory ("MMPI") and conducted a diagnostic interview to evaluate plaintiff's current level of functioning. Tr. 242. Plaintiff reported that he was not under the care of a physician and that his only medical problem concerned poor vision, which caused him to feel dizzy and have headaches, eye burning and difficulty with concentration. Tr. 243. Plaintiff stated that his vision problem "comes and goes" and that he could see better at some times than others. *Id.* Plaintiff reported that he lived with his father and did the housekeeping chores for both of them, including cleaning, cooking, laundry and grocery shopping. *Id.* During free time, he watched television, played games or talked to neighbors. *Id.*

Dr. Birky noted that plaintiff's mood was blunted. *Id.* Plaintiff reported that his mood was good when his father was not "growling" but that he sometimes got depressed when his father made him nervous. *Id.* Plaintiff had no difficulty getting up in the morning and looked forward to

the day. *Id.* He had a fine appetite and he generally slept well. *Id.* Dr. Birky observed that plaintiff was oriented times four. Tr. 244. His speech was organized and lucid and his energy level was "very adequate." Tr. 243–44. Plaintiff reported that he sometimes had difficulty remembering things. Tr. 244. He remembered two of three things after a six minute interval. Dr. Birky noted that his insight was poor and his judgment was probably fair. *Id.*

Plaintiff scored the following on the WAIS–III: Verbal IQ, 79 (8th percentile); Performance IQ, 87 (14th percentile); Full Scale IQ, 79 (8th percentile). *Id.* Plaintiff's profile on the MMPI was 2–8. People with this profile

> tend to be withdrawn due to feelings of worthlessness. They tend to keep people at a distance, fearful of emotional involvement. Significant depression with anxiety and agitation may be present, as may concentration problems and confused thinking. They are inclined to be irritable and resentful much of the time.

Tr. 245.[15]

Dr. Birky made the following diagnostic impressions:

> DSM IV, Axis I: 300.4 Dysthymic Disorder
>
> 303.90, Alcohol Dependence, by history
>
> Axis II: V71.09, No Diagnosis
>
> Axis III: Not assessed
>
> Axis VI: Psychosocial and Environment Problems: Personal health (vision) problems; Inadequate social support system; Questionable level of basic academic skills; Dependent on

others for shelter and sustenance; Unemployment

> Axis V: Current GAF = 55; Highest Past Year GAF = 55 [16]

Tr. 245. Dr. Birky opined that plaintiff was capable of administering funds in his own behalf. Tr. 246.

On July 10, 2000, Lynn W. O'Neal, M.D., examined plaintiff for a complaint of decreased vision in the right eye over the past ten years, especially during the past four years. Tr. 247. Dr. O'Neal found uncorrected vision in the right eye of 20/50, with a best corrected vision of 20/40 with a–1.00 sphere. *Id.*

On August 16, 2000, Chester L. May, M.D., performed a psychiatric examination of plaintiff. Tr. 248. Plaintiff stated that his primary difficulty over the years has been blindness in his left eye. *Id.* Plaintiff reported that he had a lot of symptoms after his wife died ten years ago, in which he would pass out and his eye would hurt badly. *Id.* Plaintiff thought that those symptoms were related to stress. *Id.* Plaintiff also reported that he had always been nervous. *Id.* Plaintiff reported no major problems with depression. *Id.* Plaintiff stated that he had a lot of trouble concentrating because of poor vision. *Id.* Plaintiff stated that he lived with his father and reported limited activities, stating that he "somewhat" helped with the housework but that his father was very confused and needed a lot of watching. Tr. 249. Plaintiff tried to do some cooking and cleaning. *Id.*

Dr. May observed that plaintiff was alert and fully oriented, but that his affect appeared mildly depressed and mildly anxious. *Id.* Dr. May noted that plaintiff had

---

**15.** Because plaintiff said that he could not read the MMPI questions due to vision problems, someone read the questions to him and plaintiff marked his own responses. Tr. 245.

**16.** A GAF score of 55 indicates moderate difficulty in social, occupational or school functioning. *See DSM–IV* at 32.

fair judgment and insight but that he had somewhat decreased concentration. *Id.* Dr. May found that plaintiff had adequate recent memory function, and that plaintiff's intelligence appeared to be "low available." *Id.*

Dr. May made the following diagnostic impressions:

Axis I: Anxiety Disorder, NOS, 300.00 Alcohol Dependence, By History, In Remission, 303.90

Axis II: None

Axis III: Blindness in Left Eye

Axis VI: Moderate Social, Occupational

Axis V: Current GAF Score: 55

Tr. 249. Dr. May opined that plaintiff was capable of administering funds in his own behalf. Tr. 250. For additional information, Dr. May referred the reader to the medical assessment of plaintiff's mental ability to do work related activities, a form which he completed regarding plaintiff's ability to perform various work related activities under various categories: (1) making occupational adjustments; (2) making performance adjustments; and (3) making personal/social adjustments. Tr. 250, 251–53. For each work related activity, the form provided a place for Dr. May to mark whether the plaintiff's abilities were *unlimited, good, fair, poor* or *none.* For most of the activities, Dr. May reported that plaintiff had a *fair* ability to perform. With respect to the ability to demonstrate reliability, under the category of making personal/social adjustments, Dr. May rated plaintiff in the *poor* range. Tr. 252.

### D. Vocational Expert Testimony

The ALJ posed the following hypothetical to vocational expert, Janice Hastert:

Assume that [the claimant] cannot perform any work activity requiring binocular vision or depth perception. Assume also because of his vision problems that the claimant cannot work at unprotected heights, around hazardous equipment or machinery, or be exposed to dust, fumes, chemical agents including soaps, smoke and gases. And that will be all due to his vision problems. And in addition to those physical limitations assume that the claimant has the following mental functional limitations. Assume that he has a mild degree of restriction in his activities of daily living from the mental standpoint. But that he can regularly perform such daily activities as attending to his personal hygiene and dressing and he can get, get himself around or transport himself okay from a mental standpoint. He doesn't have a mode of transportation but from a mental standpoint he's, he has a few if any restrictions in those areas. Assume that the claimant has a moderate degree of difficulty maintaining social functioning from a mental standpoint such that he would be precluded from more than occasional interaction from, with co-workers, supervisors or the public. Up to occasionally, that is up to about one-third of the workday, he could interact with others and complete a normal workday. But if he had to interact more frequently than occasionally during the workday with others, one could expect that he would be unable to complete a workday or a workweek without interruption from psychologically based symptoms. Assume the claimant has a mild degree of difficulty in maintaining concentration, persistence or pace, such that at least with regard to simple tasks he would regularly be able to complete simple tasks or understand, remember and carry out simple instructions in a timely manner. And assume that he has no repeated episodes of decompensation of extended duration.

Tr. 392–93. Based on this hypothetical, Hastert testified that plaintiff could work as a mold machine operator, pressing ma-

chine operator and bench assembler. Tr. 394, 396.

The ALJ asked Hastert whether the limitation of no binocular vision or depth perception would preclude plaintiff from performing the bench assembler job. Tr. 394. Hastert responded that "a lot of the bench assembly are going to be putting together parts, it's not acuity things. I mean it's going to be like assembling hair dryers. You know maybe—putting the screws in the, in the hair dryer case. Or like I'm trying to think, Hamilton (Phonetic) Lamp over here, they may be running wires through the lamp socket—and then screwing things in. So it's not close, close visual acuity required." Tr. 394–95.

The ALJ asked Hastert to change the hypothetical to assume that the claimant "would have a moderate degree of difficulty in maintaining concentration, persistence or pace such that claimant [would] often, that is at least daily, would be [precluded] from completing even a simpl[e] work task. Or understanding, remembering, or carry[ing] out even a simple job instruction in a timely manner." In response to this hypothetical, Hastert said that plaintiff could not perform any work which exists in significant numbers in the national economy. Tr. 396–97.

Plaintiff's attorney asked Hastert to change the hypothetical to add that the claimant would have "a poor ability to demonstrate reliability." Tr. 398. In response to this question, Hastert stated: "My understanding of that, that statement would be that [the] individual would lack the ability to have good attendance. And if you were missing work on a frequent basis more than, more than one time a month that would impact his ability to work as well as, as being able to follow instructions and, and, and meet work standards. Both of those appear to be affected by that statement. So yes, it would have a significant impact." *Id.*

Plaintiff's attorney asked whether any of the jobs required the use of hazardous machinery. Tr. 396. Hastert responded as follows: "The pressing machine operator's running a press but it's not something where you've got a lot of moving parts. The mold machine operator, it's not something that you're going [to] get, you know, I don't know if you've ever been in, in a plastics plant before. But typically you're, you're taking pieces off the machine and trimming the parts and, and packing them." *Id.*

### III. ALJ Findings

On May 15, 1996, the ALJ issued his first decision. Tr. 158–68. The ALJ found that from January 1, 1991 through December 12, 1993, plaintiff did not engage in substantial gainful activity. Tr. 166. The ALJ concluded that although plaintiff could not perform his past relevant work during this time, he was not disabled because he could work as a hotel porter, security guard and hand packer. Tr. 167. Beginning December 13, 1993, on account of his work at the carwash, the ALJ found that plaintiff had not experienced any period of twelve consecutive months during which he was not engaged in substantial gainful activity.[17] Tr. 165–67. Based on this finding, the ALJ concluded that plaintiff was not disabled from December 13, 1993 through May 15, 1996. Tr. 167.

On January 18, 2000, the Appeals Council remanded the case to the ALJ. Tr. 197–99. In doing so, the Appeals Council

---

17. The ALJ did not address the apparent conflict between his findings that from January 1, 1991 through December 12, 1993, plaintiff could not return to his past work at the car wash but that after December 13, 1993, plaintiff's work at the car wash constituted substantial gainful activity.

found that the ALJ did not adequately consider the worsening of plaintiff's visual impairment since December of 1993, regardless of his work activity. Tr. 197–98. The Appeals Council also found that the ALJ should have evaluated the severity and effect of plaintiff's mental impairment and addressed the specific mental limitations that the consulting psychologists identified. On remand, the Appeals Council directed the ALJ to:

- Obtain an earnings record in order to determine the proper period at issue, in light of the claimant's work activity.

- Obtain updated treatment records, if available.

- Fully develop the claimant's earnings since the alleged onset date of January 1, 1999. Give further consideration to the question of substantial gainful activity, in accordance with 20 CFR 404.1592 and under the terms of Acquiescence Ruling 92–6(10) *Walker v. Secretary*, especially, in light of the worsening of the claimant's visual impairment effective December 13, 1993. If the provisions of *Walker* apply, proceed with the sequential evaluation process to determine whether disability is established on a medical basis.

- Further evaluate the claimant's mental impairment and complete a Psychiatric Review Technique Form in accordance with 20 CFR 404.1520a and 416.920a providing appropriate rational in support of the "B" and, as applicable, the "C" criteria noted in the form.

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of the assessed limitations (Social Security Ruling 96–8p). In so doing, evaluate the treating and examining source opinions, pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96–20 and 96–5p and explain the weight given to such opinion evidence. * * *

- Further, if necessary, obtain evidence from a medical expert to clarify the nature and severity of the claimant's visual impairments . . . .

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. * * *

- Conduct the further proceeding required to determine whether alcoholism is a contributing factor material to the finding of disability.

Tr. 198–99.

On March 6, 2001, the ALJ issued his second decision. Tr. 15–25. In that decision, the ALJ found that plaintiff's work at the carwash did not constitute substantial work activity because "the work was accommodated, providing him non-competitive allowances, such as rest breaks and multiple absences from work." Tr. 16. Nevertheless, the ALJ concluded that plaintiff's work activity demonstrated that he had the ability to perform the mental functions of work such as social interaction and concentration, which was inconsistent with his allegation of disability. *Id.*

The ALJ found that the objective evidence did not support plaintiff's allegations of disabling symptoms in his right eye. Tr. 18. He noted that the medical evidence showed that vision in plaintiff's right eye is nearly normal and that doctors have recommended glasses but plaintiff does not wear them. Tr. 19. The ALJ further found that although plaintiff complained of disabling vision and headaches, he played solitaire, which was inconsistent with his

complaints. *Id.* The ALJ found that plaintiff suffered from the following impairments: (1) a blind left eye; (2) slightly decreased visual acuity in the right eye; (3) anxiety disorder, NOS; (4) dysthymic disorder; (5) recurrent sinusitis; and (6) history of alcohol dependence and abuse, in sustained remission. Tr. 16–17. The ALJ concluded that although plaintiff could not perform his past relevant work, he was not disabled because he could work as a molding machine operator, pressing machine operator and bench assembler. Tr. 24.

### IV. Standard of Review

■■■ The ALJ's decision is binding on the Court if substantial evidence supports it. *See* 42 U.S.C. § 405(g); *Dixon v. Heckler,* 811 F.2d 506, 508 (10th Cir.1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. *See Castellano v. Sec'y of HHS,* 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Court must scrutinize the record and take into account any evidence which fairly detracts from the evidence which supports the Secretary's findings. *See Nieto v. Heckler,* 750 F.2d 59 (10th Cir.1984). Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Knipe v. Heckler,* 755 F.2d 141, 145 (10th Cir.1985) (quoting *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir. 1983)).

### V. Analysis

■■■ Plaintiff bears the burden of proving disability under the SSA. *See Henrie v. United States Dep't of HHS,* 13 F.3d 359, 360 (10th Cir.1993); *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. *See* 42 U.S.C.A. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing her past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. 20 C.F.R. §§ 404.1520, 416.920 (1996). If a claimant satisfies steps one, two and three, he is disabled; if a claimant satisfies steps one and two, but not three, then he must satisfy step four. If he satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. *See Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir.1988). The Commissioner bears the burden of proof at step five. *See Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). To meet this burden, the Commissioner must show that a claimant has the residual functional capacity ("RFC") to perform jobs which exist in the national economy. *See Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir.1993).

In this case, the ALJ denied benefits at step five.[18] In doing so, the ALJ found that plaintiff had the following RFC:

---

**18.** At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 1991. Tr. 23. At step two,

no work activity requiring binocular vision or depth perception, secondary to his blind left eye; and no work activity requiring him to work at unprotected heights or around hazardous equipment or machinery, or exposing him to dust, fumes, chemical agents, soaps, smoke, or gasses, secondary to impaired vision and eye irritation. Moreover, claimant's mental impairments cause mild restriction of his activities of daily living; moderate difficulties in maintaining social functioning, preventing more than occasional interaction with co-workers, supervisors or the public during the workday without interruption from psychologically-based symptoms; mild difficulties in maintaining concentration, persistence or pace, not preventing completion of simple tasks or job instructions in a timely manner; and no repeated episodes of decompensation of extended duration.

Tr. 23–24. Based on vocational expert testimony, the ALJ concluded that plaintiff could perform a significant number of jobs which existed in the national economy, including mold machine operator, pressing machine operator and bench assembler. *Id.* at 24.

Plaintiff asserts that substantial evidence does not support the ALJ decision because the ALJ did not (1) adequately resolve conflicts between the vocational expert ("VE") evidence and information contained in the Dictionary of Occupational Titles ("DOT"); and (2) include all of plain- tiff's impairments and limitations in his hypothetical question to the VE.

## A. Whether The ALJ Adequately Resolved Conflicts Between VE Evidence And Information In The DOT

■ Plaintiff contends that the ALJ did not adequately resolve conflicts between the VE evidence and information in the DOT. The Court agrees. In *Haddock v. Apfel,* 196 F.3d 1084 (10th Cir.1999), the Tenth Circuit Court of Appeals ruled that when a conflict exists between VE testimony and the DOT, the ALJ must investigate and elicit a reasonable explanation for the discrepancy before he can rely on the VE testimony. *Id.* at 1089. The court opined that "an ALJ has a duty to fully develop the record even when the claimant is represented by an attorney, as in this case. Questioning a vocational expert about the source of his opinion and any deviations from a publication recognized as authoritative by the agency's own regulations falls within this duty." *Id.* at 1091 (citation omitted).[19]

Effective December 4, 2000, the Social Security Administration issued Social Security Ruling 00–4p ("SSR 00–4p"), 65 Fed.Reg. 75759,2000 WL 1765299. With respect to occupational information, the ruling provides:

> In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for in-

---

the ALJ concluded that plaintiff suffered from the following severe impairments:

> blind left eye secondary to a traumatic injury, a cataract, and a corneal scar; slightly decreased visual acuity in his right eye; anxiety disorder, NOS; dysthymic disorder; recurrent sinusitis; and a history of alcohol dependence and abuse, in sustained remission.

Tr. 23. At step three, the ALJ determined that the impairments did not meet or medical- ly equal one of the impairments listed in Appendix 1, Subpart P, 20 C.F.R. Part 404. Tr. 32. At step four, the ALJ found that plaintiff was unable to perform his past relevant work. *Id.* at 23–24.

**19.** The *Haddock* court noted that the Social Security Administration had not issued clear rules and regulations for dealing with a conflict between VE testimony and the DOT. *See id.* at 1089.

formation about the requirements of work in the national economy. We use these publications at steps 4 and 5 to resolve complex vocational issues.

*Id.,* 65 Fed.Reg. at 75760. If a conflict exists between VE evidence and information in the DOT, SSR 00–4p states:

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying of the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

*Id.*

SSR 00–4–p imposes an affirmative duty on the ALJ to inquire about actual and apparent conflicts between VE testimony and information contained in the DOT:

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:

— Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and

— If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

*Id.* The rule also requires the ALJ to explain in the determination how he resolved the conflict, regardless how it was identified. *Id.* at 75760–61. Before he can rely on VE evidence to support a disability determination, the ALJ must:

— Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the [DOT], including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor, and

— Explain in the determination or decision how any conflict that has been identified was resolved.

*Id.* at 75759.

In ruling that plaintiff was not disabled, the ALJ relied on VE testimony that plaintiff could perform the jobs of mold machine operator, pressing machine operator and bench assembler. Several apparent conflicts exist, however, between the DOT information on these jobs and the VE testimony that plaintiff could perform the jobs. For instance, the DOT describes the job of mold machine operator as follows:

Tends compression-molding machines that mold thermosetting plastics into products, such as automobile heater housings, ashtrays, buttons, electronic parts, plastic panels and dishes: Dumps specified amount of plastic powders or pellets into hopper of machine, or positions pellets or sausage-shaped plastics in mold installed on machine. Starts machine that compresses plastic into mold under head and pressure, and allows plastic to set for specified time. Removes handtools. *May place plastics*

*material on hot grid or in oven to soften it prior to molding.* May weigh prescribed amount of material for molding. May place plastic sheet into machine fixture to fabricate buttons.

*DOT,* 556.685–022 Compression–Molding–Machine Tender (emphasis added). According to the DOT, the job requires a general learning ability of the "Lowest 1/3 Excluding Bottom 10% Low Degree of Aptitude Ability." *Id.* The DOT further states that the position frequently demands depth perception, from one-third to two-thirds of the time. *Id.*

Here, the ALJ determined that plaintiff could not perform work which would require depth perception. The ALJ, however, did not ask the VE to explain the conflict between this limitation and the DOT statement that the position frequently requires depth perception, nor did the ALJ explain in his decision how he resolved the conflict. In addition, although the ALJ concluded that plaintiff could not work around hazardous equipment or machinery, the DOT states that a mold machine operator "[m]ay place plastics material on hot grid or in oven to soften it prior to molding." *DOT,* 556.685–022 Compression–Molding–Machine Tender. The ALJ did not ask the likelihood that plaintiff would have to place plastics material on a hot grid or in an oven, or whether such job would violate plaintiff's prohibition against working around hazardous equipment or machinery.[20] Nor did the ALJ explain how he resolved this apparent conflict. Finally, the ALJ did not address whether plaintiff's full scale IQ of 79, at the 8th percentile, precluded his ability to perform in light of the DOT information that the job requires a general learning ability which excludes the "Bottom 10% Low De-

gree of Aptitude Ability." *DOT,* 556.685–022 Compression–Molding–Machine Tender.

With respect to pressing machine operator, the DOT describes the job as follows:

Operates pressing machine to smooth surfaces, flatten seams, or shape articles, such as garments, drapes, slipcovers, and hose, in manufacturing or dry cleaning establishments, using either of following methods: (1) Spreads articles to be pressed on buck (padded) table of machine. Pulls pressing head onto article and depresses pedals or presses buttons to admit steam from buck through garments to press them and to exhaust steam from presser. Rearranges articles on puck and repeats process until pressing is complete. (2) Positions garment on buck and depresses pedal to lower jump iron onto garment and to apply pressure. Pushes lever to release steam from iron. Pushes iron attached to movable arm back and forth over garment and shifts garment under iron until garment is pressed. Hangs pressed articles on wire hangers. May operate two presses simultaneously, positioning articles on one press while another article is steamed on other press.

*DOT,* 363.682–018 Presser, Machine. According to the DOT, the job requires a general learning ability of the "Lowest 1/3 Excluding Bottom 10% Low Degree of Aptitude Ability." *Id.* The DOT further states that from one-third to two-thirds of the time, the position frequently demands depth perception and exposes the operator to extreme heat, wet and/or humidity and other environmental conditions. *Id.*

Again, the ALJ did not ask the vocational expert to explain the apparent conflict

---

**20.** Plaintiff's attorney asked whether the position required the use of any hazardous machinery. Tr. 396. The VE replied no and stated that one typically takes pieces off the machine, trimming the parts and packing them. *Id.* The VE did not address the DOT information that the position might require plaintiff to work with a hot grid or oven.

between plaintiff's depth perception limitation and the DOT information that the job frequently requires depth perception, nor did the ALJ explain how he resolved the conflict. In addition, the ALJ did not inquire or discuss whether the DOT information that "other environmental conditions" frequently exist might expose plaintiff to dust, fumes, chemical agents, soaps, smoke, or gases. Nor did the ALJ inquire or discuss whether working with hot irons and presses would require plaintiff to work around hazardous equipment or machinery.[21] Finally, the ALJ did not address whether plaintiff's full scale IQ of 79, at the 8th percentile, precludes his ability to perform when the DOT states that the job requires a general learning ability which excludes the "Bottom 10% Low Degree of Aptitude Ability." *DOT,* 363.682–018 Presser, Machine.

As to bench assembler, the DOT describes the job as follows:

> Performs any combination of following repetitive tasks on assembly line to mass produce small products, such as ball bearings, automobile door locking units, speedometers, condensers, distributors, ignition coils, drafting table subassemblies, or carburetors: Positions parts in specified relationship to each other, using hands, tweezers or tongs. Bolts, screws, clips, cements, or otherwise fastens parts together by hand or using handtools or portable powered tools. Frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker. Loads and unloads previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines,

milling machines, or broaches, to perform fastening, force fitting, or light metal-cutting operation on assembly line. * * *

*DOT,* 706.684–022 Assembler, Small Products I. According to the DOT, the job requires a general learning ability of the "Lowest 1/3 Excluding Bottom 10% Low Degree of Aptitude Ability." *Id.* The DOT further states that the position frequently demands depth perception, from one-third to two-thirds of the time. *Id.*

The ALJ did not ask the VE to explain the conflict between plaintiff's depth perception limitation and DOT information that the job frequently requires depth perception, nor did the ALJ explain how he resolved the conflict. In addition, the ALJ did not inquire whether loading and unloading previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines or broaches to perform fastening, force fitting, or light metal-cutting operation, involved working with hazardous equipment or machinery. Finally, the ALJ did not address whether plaintiff's full scale IQ of 79, at the 8th percentile, precludes his ability to perform the job in light of the DOT information that the job requires a general learning ability which excludes the "Bottom 10% Low Degree of Aptitude Ability." *Id.*

As discussed above, the ALJ failed to elicit testimony from the VE to explain actual and apparent conflicts between the VE evidence and information contained in the DOT. Because of this failure, substantial evidence does not support the ALJ decision. *See Haddock,* 196 F.3d at 1091.

---

21. Plaintiff's attorney asked generally whether the position required the use of hazardous machinery. Tr. 396. The VE replied no and stated only that the press does not involve a lot of moving parts. *Id.* The VE did not address the DOT information that the position would require plaintiff to work with hot irons and presses.

### B. Whether The ALJ Included All Of Plaintiff's Impairments And Limitations In His Hypothetical Question To The VE

Plaintiff argues that substantial evidence does not support the ALJ decision because the ALJ did not include all of plaintiff's impairments and limitations in his hypothetical question to the VE. In order for testimony elicited by a hypothetical question to constitute substantial evidence to support the ALJ decision, the hypothetical question must include a full description of a claimant's impairments. *See Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir.1991). In formulating a hypothetical question, however, the ALJ need not include any alleged limitations which he does not accept as true. *See Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985). Rather, the ALJ may restrict his hypothetical to those limitations which he has found to exist based upon substantial evidence in the record. *See Gay v. Sullivan,* 986 F.2d 1336, 1341 (10th Cir. 1993). Plaintiff contends that the ALJ failed to include the following limitations: (1) poor ability to demonstrate reliability; (2) borderline intellectual functioning; and (3) reduced vision in the right eye, disabling eye pain and inability to tolerate bright light.[22]

### 1. Poor Ability To Demonstrate Reliability

Plaintiff complains that the ALJ failed to account for his poor ability to demonstrate reliability. Specifically, plaintiff argues that the ALJ ignored the medical assessment by Dr. Day that plaintiff had a poor mental ability to demonstrate reliability in making personal/social adjustments. Plaintiff points out that the VE testified that if plaintiff lacked the ability to have good attendance—*i.e.* if he missed more than one day of work a month—it would have a significant impact on his ability to work. Plaintiff cites no evidence, however, to support that his poor mental ability to demonstrate reliability in making personal/social adjustments in any way impacted his ability to reliably attend work. As discussed below, the ALJ properly rejected plaintiff's claims that he had to miss work because of subjective complaints of poor vision, headaches or eye pain. The ALJ did not err in failing to account for a poor ability to demonstrate reliability.

### 2. Borderline Intellectual Functioning

Plaintiff asserts that the ALJ erred by not considering how his borderline intellectual functioning might affect his ability to perform work-related activities. Plaintiff's full scale IQ of 79, which is at the 8th percentile, falls within the range for borderline intellectual functioning. *See DSM–IV* at 684 (IQ in 71–84 range indicates borderline intellectual functioning). Plaintiff argues that his low IQ constitutes a mental impairment under 20 C.F.R. § 404.1520a. Defendant asserts that because Dr. Birky—the psychologist who conducted the IQ test—did not diagnose borderline intellectual functioning as a diagnosis, the ALJ did not err in failing to consider it. The record contains no evidence, however, that the diagnosis is discretionary. Moreover, Drs. Burke and Miller observed that plaintiff's level of intellectual functioning appeared to be in the borderline range. Tr. 126.

In his decision, the ALJ stated that plaintiff had an IQ of 79, which indicated a

---

**22.** Plaintiff also argues that the ALJ did not define an exertional category, *i.e.* sedentary, light, medium, heavy or very heavy, but he cites no prejudice which resulted from the alleged error. *See Bernal v. Bowen,* 851 F.2d 297, 302–03 (10th Cir.1988) (no reversible error where no prejudice to claimant).

"low average intellectual functioning." Tr. 20. Defendant concedes that the ALJ used the wrong definition to describe plaintiff IQ. *See Brief Of Commissioner* (Doc. # 13) filed January 2, 2003 at 9. Defendant argues that the ALJ nonetheless accounted for plaintiff's mental limitations by finding that he had mild restrictions in activities of daily living; moderate limitations in maintaining social functioning; mild difficulties in concentration, persistence and pace, not preventing completion of simple tasks or job instructions in a timely manner, and no repeated episodes of decompensation of extended duration. Tr. 24. In *Cockerham v. Sullivan,* 895 F.2d 492, 496 (8th Cir.1990), the Eighth Circuit Court of Appeals found that a claimant with an alleged impairment of an IQ from 70 to 79 has alleged a severe impairment and may be considered disabled after consideration of vocational factors. Here, the ALJ did not list plaintiff's IQ as an impairment. Tr. 16–17. In light of *Cockerham,* he erred as a matter of law in failing to do so. *See Callins v. Apfel,* No. 98–6415, 2000 WL 6193, at *3 (10th Cir. Jan.6, 2000).

### 3. Reduced Vision In The Right Eye, Disabling Eye Pain And Inability To Tolerate Bright Light

██ The ALJ rejected plaintiff's allegations of disabling symptoms in his right eye based on (1) lack of objective medical evidence; (2) plaintiff's failure to wear glasses; (3) inconsistent daily activities; and (4) plaintiff's failure to seek medical treatment and prescription medication. Tr. 21. Plaintiff claims that the ALJ erred in discounting his complaints of reduced vision in his right eye. Specifically, plaintiff asserts that the ALJ did not account for the slightly reduced visual acuity in his right eye. After reviewing the objective medical evidence, the ALJ concluded that plaintiff's vision in his right eye was nearly normal and that plaintiff did not wear corrective lenses despite a recommendation that he do so. Substantial evidence supports this conclusion.

██ Plaintiff also complains that the ALJ erred in discounting his subjective complaints of spots and blurred vision in his right eye, disabling eye pain and inability to tolerate bright light. The Tenth Circuit has set forth the following factors for analyzing complaints of subjective conditions: (1) whether claimant proves with objective medical evidence an impairment that causes the subjective condition; (2) whether a loose nexus exists between the impairment and the subjective condition; and (3) whether the subjective condition is disabling based upon all objective and subjective evidence. *See Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994); *Luna v. Bowen,* 834 F.2d 161, 163–64 (10th Cir. 1987). Plaintiff has satisfied the first two factors. *See id.* at 164. Thus the ALJ must consider plaintiff's assertions regarding subjective conditions and decide whether he believes them. *See id.* at 163. In determining the credibility of plaintiff's testimony, the ALJ should consider such factors as:

the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Huston v. Bowen,* 838 F.2d 1125, 1132 (10th Cir.1988).

Plaintiff argues that the record does not support the ALJ's credibility findings. In reviewing the credibility determination, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of HHS,* 933 F.2d 799, 801 (10th Cir.1991). "Credibility is the province of the ALJ." *Hamilton v. Sec'y of HHS,* 961 F.2d 1495, 1499 (10th Cir.1992). At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995); *but see Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir.2000) (*Kepler* does not require formalistic factor-by-factor recitation of evidence). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (quoting *Huston,* 838 F.2d at 1133) (footnote omitted). "In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements." *See* Social Security Ruling 96–7p, 61 Fed. Reg. at 34486. Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible." *See id.*

In discrediting plaintiff's testimony, the ALJ relied on several factors. First, he noted that plaintiff did not seek medical treatment or prescription medicine for his complaints. Second, the ALJ found that plaintiff did not wear corrective lenses despite the recommendation that he do so. Finally, the ALJ concluded that plaintiff's normal activities of playing solitaire and scavenging dumpsters for money were inconsistent with his claim of disabling subjective complaints. On this record, the Court concludes that substantial evidence supports the ALJ decision to disregard plaintiff's subjective complaints.

## VI. Conclusion

In typical circumstances, the Court would remand this case for further analysis of the effect of plaintiff's IQ scores on his RFC and his ability to perform work in the national economy. Plaintiff, however, filed his application in this case on September 17, 1993—almost ten years ago. The ALJ has had two chances to conduct a proper determination. Under these circumstances, the Court declines to remand for a further hearing. *See Allen v. Bowen,* 881 F.2d 37, 44 (3d Cir.1989) (where claimant established prima facie case of entitlement, record was fully developed, and Secretary failed to show good cause for failure to adduce relevant evidence, no reason to remand); *Eddy v. Massanari,* 180 F.Supp.2d 1255, 1273 (D.Kan.2002). In light of the ALJ failure to satisfy his burden of proof at step five and the protracted delay which has resulted from his disposition of the proceedings, the Court finds that the judgment of the ALJ should be reversed and remanded so that the ALJ can award benefits for the appropriate period. *See Ragland v. Shalala,* 992 F.2d 1056, 1060 (10th Cir.1993) (remanding for award of benefits because of Commissioner's "patent failure" to meet step five burden of proof and long delay because of Commissioner's erroneous disposition); *Frey v. Bowen,* 816 F.2d 508, 518 (10th Cir.1987) (case remanded for immediate award of benefits; over six years had passed since claimant sought disability; the record had been fully and fairly developed and the record as whole supported conclusion that claimant was disabled); *see also Wilder v. Apfel,* 153 F.3d 799, 801 (7th Cir.1998) (after eight years, time "to bring the charade to an end"); *Sisco v. United States Dep't of*

*HHS,* 10 F.3d 739, 746 (10th Cir.1993) (remanding for award of benefits; Social Security Administration not entitled to adjudicate case ad infinitum until it correctly applies the proper legal standard and gathers evidence to support its conclusion) (quotations and citations omitted).

**IT IS THEREFORE ORDERED** that *Plaintiff's Brief In Support Of Reversing The Administrative Decision Of Defendant* (Doc. # 12) filed December 2, 2002, which the Court construes as a motion for judgment, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that the judgment of the ALJ is **REVERSED.** The case is **REMANDED** to the ALJ with directions to award benefits to plaintiff for the appropriate period.